IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 20, 2016 at Knoxville

**STATE OF TENNESSEE v. ELIZABETH GARDENHIRE**

**Appeal from the Criminal Court for White County**
**No. CR-6975    David A. Patterson, Judge**

---

**No. M2015-01998-CCA-R3-CD – Filed December 29, 2016**

---

Following a jury trial, the defendant, Elizabeth Gardenhire, was convicted of theft of property valued at $1000 or more but less than $10,000, a Class D felony. The trial court sentenced the defendant as a career offender to twelve years in the Department of Correction. On appeal, the defendant challenges the sufficiency of the evidence, arguing that the State failed to establish that she acted knowingly or that the value of the property was $1000 or more. Based upon our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

Michael J. Rocco (on appeal) and Daniel Barnes (at trial), Sparta, Tennessee, for the appellant, Elizabeth Gardenhire.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Philip A. Hatch, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The defendant and a co-defendant, Walmart employee Dixie Betterton, were indicted for theft of property valued at $1000 or more but less than $10,000, based upon their theft of over $3000, achieved through a series of fraudulent transactions, from the Walmart store in Sparta, Tennessee, between July 6 and July 28, 2014.

At trial, Diane Keele, an asset protection associate at the Sparta Walmart, testified that she had reviewed the store's surveillance video covering the dates of July 6-28, 2014, and identified the video, which was published to the jury and admitted as an exhibit. She identified the defendant on the video, as well as in the courtroom. Ms. Keele said she retrieved receipts from the store's computer database related to the time period of the theft, which were also admitted as exhibits. All fourteen receipts contained price overrides, competitive price matches, voided entries, debit loads,[1] or refunded items. The receipts reflected that each fraudulent transaction took place at cash register number 9 and that Ms. Betterton was the cashier in the majority of the transactions. Ms. Keele said that the total loss to Walmart was $3250.90 and explained the dates and various items the defendant received in each transaction, which are summarized as follows:

July 6, 2014 at 2:28 a.m. – household items and men's clothing, resulting in a loss of $28.90;

July 7, 2014 at 3:22 a.m. – a fishing rod, tea lights, Bic lighters, and other items, resulting in a loss of $131.81;

July 14, 2014 at 11:40 p.m. – beer, steaks and other meats, men's shoes, snack cakes, candy, and other items, resulting in a loss of $97.21;

July 14, 2014 at 3:27 a.m. – a debit load for $277.99 and $20 cash, resulting in a loss of $297.99;

July 14, 2014 at 3:31 a.m. – skin care items, resulting in a loss of $9.95;

July 22, 2014 at 12:55 a.m. – a debit load for $477 and $3 fee, resulting in a loss of $480;

July 22, 2014 at 1:08 a.m. – "tattoo goo," solar lights, clocks, blue jeans, Bic lighters, shoes, candy, soft drinks, and other items, resulting in a loss of $311.62;

July 23, 2014 at 3:23 a.m. – a debit load for $400 and $3 fee, which the defendant paid, resulting in a loss of $400;

---

[1] The witness explained that a debit load occurred when, for a fee, a customer placed a certain amount of money onto a debit card and paid for that amount with either cash or another debit card.

July 25, 2014 at 1:16 a.m. – a cash refund for a sound bar, resulting in a loss of $48;

July 25, 2014 at 1:36 a.m. – a debit load for $223, resulting in a loss of $222;[2]

July 27, 2014 at 2:44 a.m. – a debit load for $450, resulting in a loss of $450;

July 27, 2014 at 3:17 a.m. – numerous articles of clothing, carabiners, binder pouches, and other items, resulting in a loss of $264.92;

July 28, 2014 at 2:02 a.m. – a carton of cigarettes, resulting in a loss of $50.50; and

July 28, 2014 at 2:03 a.m. – a debit load for $475 and $3 fee, with a $20 cash tender, resulting in a loss of $458.

Dixie Betterton testified that she had pled guilty to theft over $1000 in this case and was awaiting her sentencing hearing. She said the defendant approached her one evening when she was on a smoke break, told her she had recently taken in some family members, and was having a hard time providing "daily essentials" for them. Ms. Betterton informed the defendant about the store's price match policy, after which the defendant shopped and checked out at Ms. Betterton's register. Ms. Betterton said that "everything [was done] by the books" in this transaction. She and the defendant then discussed if "there was a way to load money on [a debit] card without actually having all of the money up front." Ms. Betterton explained the debit load process she used: "[The defendant] comes up and she hands me the card, either she has to buy it or she's previously bought it . . . . I hit a specific code on the register, . . . swipe the card and load however much she needs and it charges a fee and you pay the money." She further explained that the defendant mimicked this process by giving Ms. Betterton a "fake card" and "keep[ing] the front covered up and you slide it and act like you type in your pin and ask for money back."

Ms. Betterton identified store receipts bearing her operator number and acknowledged that she was the cashier for the majority of the transactions. She said that the transactions occurred between 1:30 and 3:30 a.m. when the store managers were usually on their break.

---

[2] Ms. Keele testified that the debit load was for $223 and the receipt reflects that amount. However, Ms. Keele later testified that the loss for this transaction was $222.

The defendant testified that she met Ms. Betterton through a mutual friend and had known her for three years prior to July 7, 2014. The defendant acknowledged that the $1700 monthly disability benefit she received was enough for her "to survive on." She denied making any of the fraudulent transactions but admitted that she had "a lot of criminal history," with her last conviction occurring in 2008 or 2009. She said she had changed her life and did not "have to string out on drugs trying to steal this and that." The defendant said that she had never been banned from Walmart or caught shoplifting there. She elaborated, "[I]f I was stealing their stuff and . . . wouldn't pay for it in the store, somebody should have stopped me before a whole month or fifteen transactions went through."

The defendant acknowledged that, at the time of the offense, Ms. Betterton was living with her and that they had "got[ten] into it" because Ms. Betterton refused to pay the $50 weekly rent the defendant was charging her. On cross-examination, the defendant admitted that she had prior convictions for "a bunch of forgeries" and burglary of a motor vehicle. She acknowledged that she did not have consent from Walmart to take any of the property and that she had refused to sign a "no trespassing paper" at the store. On redirect, the defendant denied using a "fake card" to make any of the transactions, saying that she swiped her card to transfer funds and "truly paid for it."

As a rebuttal witness, the State called Brandon Upchurch, the asset protection manager at the Sparta Walmart. Mr. Upchurch testified that it was impossible for customers "to swipe a card to load a debit card that they have purchased and the receipt show cash was tendered."

## ANALYSIS

The defendant argues that the evidence is insufficient to support her conviction because she had no control over the cash register and the State failed to prove that she acted "knowingly." She also argues that the State did not prove the value of the property was $1000 or greater.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn.

1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523, 527 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a). Theft of property valued at $1000 or more but less than $10,000 is a Class D felony. Id. § 39-14-105(a)(3). A person "acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result" and "acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(a), (b).

Viewed in the light most favorable to the State, the evidence established that the defendant made fourteen fraudulent transactions at the same cash register, mostly when Ms. Betterton, whom the defendant knew, was the cashier. The defendant made the transactions during times when the store managers were on their breaks. The defendant and Ms. Betterton discussed ways to load a debit card "without actually having all of the

money up front." Ms. Betterton testified the defendant mimicked the debit load process by giving Ms. Betterton a "fake card" and "keep[ing] the front covered up" out of view of the store cameras. Although the defendant denied using a "fake card," the jury obviously found the testimony of the State's witnesses more credible than that of the defendant. The value of the property listed on the store receipts, showing a total loss of $3250.90, was established by Ms. Keele's testimony. We conclude that the evidence is sufficient to establish that the defendant acted knowingly and that the value of the property taken from Walmart was $1000 or more.

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgment of the trial court is affirmed.

_____
ALAN E. GLENN, JUDGE